# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RONALD D. KENDALL,

          Plaintiff,

v.

TWIN CITIES IRON WORKERS PENSION
PLAN, BOARD OF TRUSTEES OF THE
TWIN CITY IRON WORKERS PENSION
PLAN, and WILSON-MCSHANE
CORPORATION,

          Defendants.

**Memorandum of Law & Order**
Civil File No. 10-3140 (MJD/JJG)

---

David E. Wandling, Wandling Law Group, PC, Counsel for Plaintiff Ronald D.
Kendall.

Deborah A. Ellingboe, Justin P. Krypel, and Steven L. Severson, Faegre Baker
Daniels LLP, Counsel for Defendants Twin City Iron Workers Pension Plan,
Board of Trustees of the Twin City Iron Workers Pension Plan, and Wilson-
McShane Corporation.

---

## I.    Introduction

This matter is before the Court on Defendants Twin City Iron Workers

Pension Plan, Board of Trustees of the Twin City Iron Workers Pension Plan, and

Wilson-McShane Corporation's motion for summary judgment. [Docket No. 37.]

Oral argument on the motion was heard on June 1, 2012.

## II.    Background

### A.    Factual History

Plaintiff Ronald D. Kendall began work as an ironworker in 1976. With few exceptions, he remained in that profession for over thirty years before retiring in September 2009. Until the end of 2005, he participated in the International Association of Bridge, Structural and Ornamental Iron Workers Local 793 Pension Plan ("793 Plan," Wandling Decl. [Docket Nos. 46-47], Ex. C)— a defined benefit pension plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA") and maintained for the benefit of North Dakota ironworkers. On December 31, 2005, the 793 Plan was merged into Defendant Twin City Iron Workers Pension Plan ("TCIW Plan," Wandling Decl., Ex. G), and Plaintiff thereafter was a participant in the TCIW Plan until his retirement.

When Plaintiff worked outside of the 793 Plan's North Dakota jurisdiction, the Iron Workers International Reciprocal Pension Agreement applied. ("Reciprocal Agreement," Wandling Decl., Ex. D.) The Reciprocal Agreement provides that the local union pension fund collect pension contribution

payments from employers and forward them back to the employee's "home plan." Local plans are to collect contributions based on their local contribution levels and "shall transfer the actual dollar amount of contributions received regardless of any difference in the contribution rates between the Funds." (Id., "Exhibit 'B'" § 5.) From December 1987 until December 2005 the majority of Plaintiff's work was in the jurisdiction of the TCIW. TCIW thus collected pension contributions from Plaintiff's employers and forwarded them to the 793 Plan—Plaintiff's "home plan." This case concerns the pension benefit granted to Plaintiff upon his retirement based on the contributions forwarded from TWIC to the 793 Plan between 1988 and 2000.

In the years Plaintiff participated in the 793 Plan and worked in the TCIW's jurisdiction, he received statements from the 793 Plan's third-party plan administrator, American Benefit Plan Administrators ("ABPA"). (Id., Ex. F.) The ABPA statements included an accounting of "Hours Reported by Employers." The parties agree that the hours reported in the ABPA statements reflect many more hours than those actually worked by Plaintiff in the years covered. The reported hours appear to have been calculated based on an assumed contribution rate of $0.70 per hour. That is, for a given year, the dollar amount of pension

contributions forwarded to the 793 Plan was divided by 0.70 and the result was the "hours reported" figure included on the APBA statements. For example, in 1989, TWIC forwarded $4,879.26 in contributions to the 793 Plan. That amount, divided by 0.70, equals the 6,970 "hours reported" figure on the ABPA statements, while Plaintiff actually worked only 1,826 hours during the relevant time period.

Until some point in 1999 or 2000, the ABPA reports stated that the "hours reported" were "UNAUDITED" that that "ALL HOURS REPORTED AND CREDIT INDICATED WILL BE VERIFIED AT THE TIME OF RETIREMENT." (Id.) During this time period, Plaintiff also received statements from TCIW, stating the actual hours that he had worked in its jurisdiction. (Defs.' Mem. [Docket Nos. 39-40], Ex. J.)

Sometime in the late 1980s or early 1990s, after receiving an ABPA statement which indicated that he had worked over five thousand hours more hours than he had actually worked, Plaintiff spoke with an ABPA representative to inquire if the figure was accurate. (Kendall Dep., id., Ex. E, 57:10-21; Kendall Decl. [Docket No. 45] ¶ 12.) He states that ABPA informed him that the figure

was accurate and that he should use the figure to figure his future retirement benefits.  (Id.)

The 793 Plan and the TCIW Plan merged on December 31, 2005, and all of the 793 Plan's assets and liabilities were assumed by the TCIW Plan.  The parties agree that TWIC is obligated to pay benefits earned by Plaintiff as of that date. At all relevant times, Defendant Wilson-McShane Corporation ("Wilson-McShane") has been the administrative service provider for the TCIW Plan. Thus, when the two plans merged, Wilson-McShane began to administer Plaintiff's pension.  Wilson-McShane provides administrative services for the TCIW Plan, including receiving contributions from employers, bookkeeping, recordkeeping, and calculating benefits based on the plan terms.  Wilson-McShane maintains, however, that it is the Defendant Board of Trustees of the TCIW Plan ("Trustees") that bears the ultimate decision making authority with respect to benefit calculations.

In May 2006, in response to an inquiry by Plaintiff, a Wilson-McShane employee prepared an estimate of Plaintiff's accrued pension benefits.  The total estimated monthly benefits, assuming retirement at age 55 and a single life benefit, was $3,595.  (Defs.' Mem., Ex. L.)  Plaintiff again sought an estimate of

his pension benefits in March 2009. At that time Wilson-McShane estimated that he would be entitled to either a $3,410.31 or $3,308.00 monthly benefit under the 793 Plan and a $207.64 monthly benefit under the TCIW Plan. (Id., Ex. M.)

Plaintiff believed that his benefits should have been calculated to be higher based on the "reported hours" figures in the ABPA statements that he had received. He met with Wilson-McShane representatives who showed him a computer printout and explained how Wilson-McShane arrived at its estimate. (See id., Ex. X.) The printout shows the total contribution forwarded to the 793 Plan on Plaintiff's behalf, a contribution "rate," and an "hours" figure which is the same as the "hours reported" figure which appeared on the ABPA statements which Plaintiff had received. The Wilson-McShane employees explained to Plaintiff that the "hours reported" figures on the printout were incorrect and that his estimated benefit was based on the actual total contributions made on his behalf by employers, which were correctly reflected on the printout.

In June 2009, Plaintiff applied for his retirement benefits. Wilson-McShane applied essentially the same formula that it had when providing Plaintiff with estimates: It took the actual yearly payments made on Plaintiff's behalf by his employers to the fund and multiplied those figures by percentages

set out in the 793 Plan.  (See 793 Plan, § 3.02.)  The total monthly benefit derived

from this calculation is significantly lower than the one based on the ABPA's

inflated "reported hours" to which Plaintiff believes that he is entitled, but it is

quite similar to the estimates previously prepared by Wilson-McShane.

Through counsel, Plaintiff objected to Wilson-McShane's calculation.  His

objection was presented to Joint Benefits Committee of the TCIW Plan Board of

Trustees.  The Committee concluded that Wilson-McShane's calculation was

correct, and it directed Wilson-McShane to deny Plaintiff's request for a larger

pension benefit.  (Defs.' Mem., Ex. R at 2-3.)  Plaintiff appealed the decision and,

in a February 19, 2010 letter, the Trustees denied his appeal.  (Id., Ex. K.)  The

Trustees explained that they had calculated Plaintiff's benefit amount by

multiplying the total actual contributions made by Plaintiff's employers over the

disputed years by the percentages or "contribution rates" specified in the 793

Plan.  (Id. at 2.)  The Board of Trustees stated that the "hours reported" figures

from the ABPA were erroneous and did not affect the pension benefit

calculations because, pursuant to the plan's plain language, those calculations

should be based on the actual contributions made by Plaintiff's employers.  (Id.

at 3 n.3.)

## B. Procedural History

Plaintiff brought this action in July 2010, naming the current Defendants as well as ABPA and the 793 Plan in his complaint and asserting numerous claims. Defendants moved to dismiss Plaintiff's complaint. In an April 11, 2011 Memorandum of Law & Order [Docket No. 27], the Court dismissed all claims against ABPA and the 793 Plan. The Court also dismissed several of Plaintiff's claims against the current Defendants, but the Court also allowed other claims to remain and granted Plaintiff leave to file an amended complaint. Plaintiff's Amended Complaint [Docket No. 28] now asserts two claims: Count I sets forth an ERISA denial of benefits claim against the TCIW Plan and the TCIW Plan Trustees, while Count II asserts a promissory estoppel claim against Wilson-McShane. Discovery having concluded, the remaining defendants have now moved for summary judgment as to both counts.

## III. Discussion

### A. Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. <u>Id.</u> at 323. Summary judgment is appropriate only when "there is no dispute of fact and where there exists only one conclusion." <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u> "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999).

### B.    Count I:  Denial of Benefits under ERISA

#### 1.  Standard

The parties agree that the TCIW Plan is governed by ERISA. Under 29 U.S.C. § 1132(a)(1)(B), Plaintiff—a participant in the plan—in entitled to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Where a denial of benefits is based on an interpretation

of the terms of the plan, that decision is to be reviewed under a de novo

standard, "unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the

terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115

(1989). In such a case, the Court will review the decision only for an abuse of

discretion. Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1344 (8th Cir. 1997).

Here both the 793 Plan and the TCIW Plan provide that "[t]he Trustees

shall, subject to the requirements of the law, be the sole judges of the standard of

proof required in any case and the application and interpretation" of plan terms.

(793 Plan § 10.06; TCIW Plan § 6.03.) Both plans clearly grant the Trustees

discretionary authority to determine Plaintiff's benefit eligibility, and Plaintiff

does not argue to the contrary. Thus, the Court will review the Trustees'

decision to deny Plaintiff additional benefits only for an abuse of discretion.

Under an abuse of discretion standard, the Court may only invalidate the

Trustees' decision if that decision was unreasonable. Hutchins, 110 F.3d at 1344.

"An interpretation is reasonable if a reasonable person *could* have reached a

similar decision, given the evidence before him." Id. (citation omitted). In Finley

v. Special Agents Mut. Benefit Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992), the

Eighth Circuit identified five factors relevant in determining whether an interpretation of a benefit plan is reasonable:

> The factors are 1) whether the interpretation is consistent with the goals of the plan; 2) whether the interpretation renders any language in the plan meaningless or makes the plan internally inconsistent; 3) whether the interpretation conflicts with ERISA; 4) whether the interpretation has been consistent; and 5) whether the interpretation is contrary to the clear language of the plan. These factors present discrete questions; they need not be examined in any particular order.

Hutchins, 110 F.3d at 1344 (citing Finley).

## 2. The Disputed Language

At the heart of this dispute is the Trustees' interpretation of the following language from the 793 Plan, as amended, which sets out the formula for benefit calculation:

> A Regular Pension that becomes effective on or after May 2, 2005, shall be a monthly amount equal to the sum of:
>
> ***
>
> 3. Four and three-tenths percent (4.3%) of the Contributions made on the Employee's behalf during a Plan Year on and after October 1, 1988 and before October 1, 1995 …, plus
> 4. Three and fifty-six hundredths percent (3.56%) of the Contributions made on the Employee's behalf during a Plan Year on and after October 1, 1995 and before October 1, 2002. . . .

(793 Plan § 3.02(i).)  The 793 Plan defines "contributions" as "payments made or required to be made by Employers to the Trust Fund for work by Employees in Covered Employment."  (Id. § 1.07.)

The Trustees concluded that the "contributions" relevant for determining Plaintiff's monthly pension benefit were those payments actually made by Plaintiff's employers and forwarded to the 793 Plan on Plaintiff's behalf.  Plaintiff contends that his "contributions" should be derived from the inflated "hours reported" figures reported in the ABPA statements.

### 3. Whether the interpretation is consistent with the goals of the plan.

Plaintiff contends that the Trustees' interpretation is inconsistent with the goal "that Iron Workers be protected" because it denies him the benefits to which he believes he is entitled.  The Trustees' argue that their decision is consistent with two interrelated goals of the 793 Plan.  First, the decision is consistent with the goal of any ERISA plan—to provide benefits consistent with its terms.  See Darvell v. Life Ins. Co. of N. Am., Civ. No. 07-2113 (PJS/RLE), 2008 WL 5120993, at *11 (D. Minn. Dec. 3. 2008) ("[I]t cannot be the case that any interpretation that narrows coverage is inconsistent with a plan's goals, for the goal of any plan is to provide coverage consistent with its terms"), aff'd 597 F.3d 929 (8th Cir. 2010).

Second, the Trustees argue that their interpretation is consistent with the goal of conserving resources so that other participants can receive the benefits to which they are entitled.  See, e.g., Geib v. N.Y. State Teamsters Conference Pension & Ret. Fund, 758 F.2d 973, 978 (3d Cir. 1985) ("At times, restricting the amounts paid to some [pension plan participants] may be necessary to prevent loss to others.").

This Finley factor is not dispositive.  Both parties have identified legitimate goals and the competing interests inherent in any pension plan.  Trustees often have "conflicting obligations . . . to preserve the financial security of a pension fund and yet apply the assets to the greatest possible advantage for the beneficiaries."  Id.  The question of whether the Trustees reasonably navigated between those goals turns on whether their interpretation is faithful to the text of the 793 Plan.

**4.  Whether the interpretation is contrary to the clear language of the plan and whether the interpretation renders any language in the plan meaningless or makes the plan internally inconsistent.**

The second and fifth factors of the Finley test require an examination of the disputed text of the 793 Plan.  Plaintiff argues that the "clear language" of the 793 Plan provides that the "contribution" figure used to calculate his pension should

be determined as a product of the "hours reported" from the ABPA statements and "the applicable hourly contribution rate" applied during the relevant year. Many of Plaintiff's arguments on this point refer to evidence outside of the language of the Plan itself, and those arguments are discussed below.

Plaintiff's first argument as to the <u>text</u> of the Plan is that the definition of "contributions" contained in the Plan does not apply to the payments forwarded to the 793 Plan in accordance with the Reciprocal Agreement because those payments were not "made or required to be made by Employers to the Trust Fund." (793 Plan § 1.07.) Plaintiff argues that only where an employer is "obligated" to make payments directly to the 793 Fund does the payment qualify as a "contribution." This argument ignores the word "or" in the 793 Plan's definition of "contribution." While employers outside of the 793 Plan's jurisdiction were not "required" to make payments directly to the fund, it is plain enough that their payments were, eventually, "made . . . to the Trust Fund."

Other parts of the 793 Plan affirm a conclusion that the payments in question here were "contributions." Section 5.05 of the 793 Plan addresses payments made according to the Reciprocal Agreement. It refers to those

payments as "contributions," stating that the "Cooperating Pension Fund shall transfer the actual dollar amount of <u>contributions</u> received regardless of any difference in the contribution rates between the Pension Funds." (793 Plan § 5.05(a) (emphasis added).)

Section 5.05 also provides what Plaintiff terms a "2,500 pension hour cap" implemented on October 1, 2000, which states:

> [W]here this Trust Fund, as the Home Pension Fund, receives transfers of contributions from a Cooperating Pension Fund on behalf of a Participant, the maximum pension benefit any such Participant may accrue in a Plan Year shall be a contribution amount based on two thousand five hundred (2,500) Hours of Service at the contribution rate of this Trust Fund, regardless of the contribution rate of the Cooperating Pension Fund or the total amount of contributions transferred to this Trust Fund. This subsection . . . shall serve to limit the amount of contributions credited to a Participant whose contributions have been transferred to this Trust Fund as the Home Pension Fund for purposes of benefit accrual, as well as the number of Pension Credits such a Participant may accrues, in any Plan Year.

(793 Plan § 5.05(b).) Plaintiff argues that this cap indicates that 793 Plan benefit calculations were to be based on "credited <u>hours</u>" not actual contribution amounts. He questions why this 2,500-hour cap would have been implemented if the relevant figure was the actual amount of contributions.

The plain text of § 5.05 does not support Plaintiff's argument. Section 5.05 does not actually create a "2,500 hour cap." It caps the total amount of

<u>contributions</u>—i.e. funds forwarded under the reciprocal agreement—credited to a participant. Section 5.05 ultimately creates a "dollar cap," not an "hour-cap." The use of the 2,500-hour figure (along with the applicable contribution rate) merely sets the amount of the dollar cap for any given year. The language of § 5.05, which explicitly refers to the payments forwarded under the Reciprocal Plan as "contributions" supports the Trustees' interpretation of the text of the 793 Plan.

Plaintiff has not pointed to any other language in the Plan which would be rendered meaningless or inconsistent by the Trustees' interpretation of the term "contribution" as the actual dollar value of payments made to the fund on Plaintiff's behalf pursuant to the Reciprocal Agreement. If anything, it seems that Plaintiff's interpretation would lead to inconsistencies. If the term "contributions" meant what Plaintiff contends it does (applying only to payments made by employers with an obligation to make payments directly to the 793 Plan), then Section 5.05 would be incomprehensible. In sum, this <u>Finley</u> reasonableness factor militates strongly in favor of the Trustees.

### 5. Whether the Trustees' interpretation conflicts with ERISA.

Plaintiff contends that the Trustees' interpretation "conflicts with substantive and procedural requirements of ERISA" but he does not point to any

ERISA requirements which are alleged to have been violated. (Pl.'s Mem. [Docket No. 44] at 35.) In fact, Plaintiff does not cite to a single ERISA provision in his opposition brief—apart from the provision which provides his cause of action in this case.

The Trustees note that they followed the necessary ERISA procedures, allowing Plaintiff a full and fair review as required by 29 U.S.C. § 1133(2). See Midgett v. Wash. Grp. Int'l Long Term Disability Plan, 561 F.3d 887, 893 (8th Cir. 2009). Plaintiff was afforded an opportunity to appeal the denial of his request for additional benefits. When denying Plaintiff's appeal, the Trustees provided him with a five-page explanation of their decision and, upon Plaintiff's request, the Trustees provided Plaintiff with a copy of the administrative record.

Since Plaintiff has not pointed to an ERISA provision which he alleges conflicts with the Trustees' interpretation, he cannot succeed with respect to this Finley factor.

### 6. Whether the interpretation has been consistent.

Plaintiff argues that the Trustees' interpretation of contributions has not been consistently applied in the past. Plaintiff states that he "is the last of those individuals who were promised 793 Plan benefits based upon 'credited pension hours' as reported by ABPA" and that "[o]ther 793 Plan participants received

17

their promised and earned pension benefits."  (Pl.'s Mem. at 40.)  If supported by evidence, the allegation that the Trustees applied a different formula to other 793 Plan participants would cast serious doubt on the consistency of the Trustees' approach.

Plaintiff does not cite to evidence in the record which supports the allegation that the Trustees have ever used the calculations urged by Plaintiff in other cases.  The only evidence lending support to such an allegation is a statement by a former trustee who stated that the reciprocity cap implemented before the 793 Plan merged with the TCIW Plan was enacted because:

> if a 793 member was working in another local where they happened to have a higher contribution rate on the pension fund, from what I gather they would send the money back and then they would convert that to an hours number or something or other and it [led] to some whopper pensions[,] I think is what happened.

(Witt Dep., Wandling Decl., Ex. K, at 55:18-24.)  It is hard know whether this statement confirms that pensions were actually calculated as Plaintiff suggests (by adopting the "hours reported" figures calculated by ABPA) or whether higher actual contributions (payments reciprocated from other jurisdiction) led to the "whopper pensions."  In any event, the testimony quoted above refers to pensions calculated long before the merger of the two plans and before the TCIW Trustees had made any decisions on 793 Plan benefits.  It does not cast doubt on

18

the Trustees' calculation of pension benefits, or suggest that the Trustees' have

calculated other union members' benefits differently.

All relevant record evidence indicates that the TCIW Trustees have been

consistent. An affidavit by Barbara Gutzmer, a Pension Specialist at Wilson-

McShane states:

> Since December 2005, when the 793 Plan merged into the TCIW
> Plan, no participant in the plan has made a claim for pension
> benefits earned in plan years 1989 through 2000 based on "credited
> hours" set forth in [the ABPA statements]. Moreover, since the
> merger of the two plans, Wilson-McShane and the Trustees of the
> TCIW Plan have consistently applied their interpretation of the 793
> Plan to persons who elected to reciprocate Contributions into the
> Plan. Thus, for those plan participants with reciprocated
> Contributions who elected to retire and were eligible for a regular
> pension earned during plan years 1989 (beginning October 1988)
> through 2000, Wilson-McShane and the Trustees took the actual
> Contributions made or required to be made by employers on that
> participant's behalf and multiplied that number by the applicable
> percentage reflected in the 793 Plan.

(Gutzmer Aff. [Docket No. 41] ¶ 7.) Moreover, the Trustees have submitted

evidence that the same calculations were used when determining the benefits of

another ironworker in a situation similar to Plaintiff's and who retired two years

before Plaintiff. (Defs.' Mem., Ex. V.) There, as here, benefits were based on a

percentage of <u>actual contributions</u> made on the worker's behalf during the

relevant period. In the absence of any evidence tending to refute this evidence or

show that the Trustees have in fact been inconsistent in their approach, at this stage the Court may not credit Plaintiff's unsupported assertion to the contrary.

As further evidence of inconsistency, Plaintiff points to a "Summary of Material Modifications" which was sent to 793 Plan participants when that plan was merged with the TCIW plan ("Modification Summary"). (Wandling Decl., Ex. P.) The Modification Summary stated that the "accrued benefit of each 793 Plan participant will be determined as of December 31, 2005." (Id. at 1.) As relevant here, it explained that the following formulas would be applied to determine benefits accrued:

> 4.30% of contributions made on the participant's behalf from October 1, 1988 through September 30, 1995; plus
> 3.56% of contributions made on the participant's behalf from October 1, 1995 through September 30, 2002; . . . .

(Id.) At the end of the Modification Summary, a "Summary Example" sets out an example benefit calculation for a hypothetical worker who worked 1,500 hours a year. (Id. at 8.) The example then asks the reader to "suppose" a series of contribution rates for the years in the example which are multiplied by 1,500 to arrive at a contribution level for each year. The "contributions" are then multiplied by the relevant percentage multiplier to arrive at the hypothetical participant's monthly benefit.

Plaintiff argues that the Modification Summary supports his view of how his benefits should be calculated—starting with the "reported hours" as stated on his ABPA statements, multiplying by the contribution rate for each year, and then multiplying the result by the percentage set out in the 793 Plan. There are a number of problems with this argument. First, the Modification summary language closely tracks that of the 793 Plan itself, explaining that benefits are calculated as a percentage of "contributions made on the participant's behalf." Second, while the "Summary Example" does suggest that the participant multiply the number of hours worked and the applicable contribution rate, that calculation is provided to allow the participant to calculate the <u>actual</u> total payments made by employers on that employee's behalf in a given year. Moreover, there is no validation of Plaintiff's suggestion that his calculations should start with a much larger number of hours than those actually worked. The 1,500-hour figure in the example represents the <u>actual</u> number of hours worked by the hypothetical employee.

Plaintiff also points to a 2004 Summary Plan Description of the 793 Plan as evidence of inconsistency. ("793 Summary," Wandling Decl., Ex. O.) The 793 Summary—prepared before the merger of the 793 Plan with the TCIW Plan

contains language very similar to that contained in the later Modification

Summary. First it states that all benefits earned after October 1, 1988 are "based

on a 'percentage of contribution formula,'" which "means that your accrued

Regular Pension is equal to a percentage of the contributions made on your

behalf." (Id. at 13.) The 793 Summary then provides an example calculation for

an employee who worked 1,500 hours per year. (Id. at 15.) To arrive at the

correct "contribution" figure, the example multiplies the number of hours

worked times the applicable contribution rate for the year.

As above, the goal of these calculations to arrive at the <u>actual</u> amount of

payments made on the employee's behalf for a particular plan year to arrive at a

"contribution" figure. There is no mention of a situation where an employee

would or should use an hours figure divorced from the actual number of hours

worked in a particular year in question. The 793 Summary also contains a

section on "Transfer of Contributions" under the Reciprocal Agreement. Like the

793 Plan itself, the 793 Summary refers to transferred payments from out-of-

jurisdiction employers as "contributions," which again undermines Plaintiff's

argument that those payments should not be considered "contributions" under

the 793 Plan.

In sum, the Court fails to find any inconsistency between the Summary Plan Description or the Modification Summary and the approach taken by the Trustees with respect to their calculation of Plaintiff's benefits.

### 7.  Remaining Argument:  ABPA Statements

The <u>Finley</u> reasonability factors point strongly in favor of the Trustees' interpretation of the 793 Plan.  The Trustees' interpretation is consistent with the plain language of the Plan, it does not render the Plan inconsistent, it does not contravene ERISA or its own stated goals, and it has been consistently applied.

What is left is the compelling fact that, over many years, ABPA persisted in sending Plaintiff statements containing inflated "reported hours," which had no basis in reality.  While the parties contest the extent to which Plaintiff relied on those statements to plan his retirement, there is certainly evidence in the record indicating that Plaintiff believed that he would be entitled to a larger pension benefit than that which he ultimately received.  At the same time, however, when Plaintiff approached Wilson-McShane for estimates of his retirement benefits, the undisputed evidence shows that he was provided with an accurate projection.

The Court cannot invalidate the TCIW Trustees' reasonable decision simply because a previous plan administrator sent Plaintiff statements with

erroneous "reported hours" figures. "The discretionary decision of a plan administrator is not unreasonable merely because a different, reasonable interpretation could have been made." Ratliff v. Jefferson Pilot Fin. Ins. Co., 489 F.3d 343, 348 (8th Cir. 2007) (citation omitted). Given the clear language of the 793 Plan and the Trustees' responsibility to protect the resources for all Plan participants, it is not so clear that a reasonable administrator might have reasonably found in Plaintiff's favor. For all of these reasons, the Court will grant the TCIW Plan and the TCIW Trustees' motion for summary judgment as to Plaintiff's ERISA claim.

## C. Count II: Promissory Estoppel

### 1. Standard

"The principle of estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny that representation." Chorosevic v. MetLife Choices, 600 F.3d 934, 942 (8th Cir. 2010) (citation omitted). "Courts may apply the doctrine of estoppel in ERISA cases only to interpret ambiguous plan terms." Fink v. Union Cent. Life Ins. Co., 94 F.3d 489, 492 (8th Cir. 1996). "Common-law estoppel principles cannot be used to obtain benefits that are not payable under the terms of the ERISA plan," id., and a plaintiff "may not use an

estoppel theory to modify the unambiguous terms of an ERISA plan." <u>Neumann v. AT&T Commc'ns, Inc.</u>, 376 F.3d 773, 784 (8th Cir. 2004).

Moreover, courts should, "not use federal common law to allow a damages claim against a nonfiduciary because ERISA's carefully drafted enforcement provisions provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." <u>Fink</u>, 94 F.3d at 493 (citation omitted). Finally, some circuits have adopted an additional test for estoppel claims in the ERISA context, requiring plaintiffs to show "extraordinary circumstances" amounting to "conduct tantamount to fraud." <u>See, e.g.</u>, <u>Greifensberg v. Harford Life Ins. Co.</u>, 131 F. App'x 756, 759 (2d Cir. 2005).

The Court concludes that Plaintiff's promissory estoppel claim against Wilson-McShane cannot succeed because the language of the 793 Plan is unambiguous and also because the evidence, viewed in the light most favorable to Plaintiff, could not support a finding that Wilson-McShane made misleading representations relied upon by Plaintiff.

### 2. Ambiguity in the 793 Plan

"Courts may apply the doctrine of estoppel in ERISA cases only to interpret ambiguous plan terms." <u>Fink</u>, 94 F.3d at 492. Plaintiff argues that the

793 Plan is ambiguous because of the different answers that he received from various union representatives and plan administrators over the years.  There is certainly evidence that Plaintiff was told by various people that his benefits would be calculated based on the "hours reported" in the ABPA statements.

The fact that Plaintiff received different information from various representatives does not, however, indicate that the 793 Plan's terms are ambiguous.  As discussed above, the text of the 793 Plan is clear:  For the benefit years disputed in this case, a participant's monthly benefit is calculated by multiplying contributions paid on the employee's behalf by a set percentage.  Payments transferred from outside employers to the fund through the Reciprocal Agreement are "contributions."

 "Common-law estoppel principles cannot be used to obtain benefits that are not payable under the terms of the ERISA plan."  Id.  Here, Plaintiff is asking the Court to award benefits which the unambiguous terms of the 793 Plan do not allow.

### 3.  Representations by Wilson-McShane

The Court allowed Plaintiff's promissory estoppel claim to survive Wilson-McShane's motion to dismiss based on Plaintiff's pleading that Wilson-McShane had made "numerous representations . . . that Plaintiff's monthly benefit

entitlement would be calculated as a function of credited pension hours." At this later stage of litigation, Wilson-McShane now notes that Plaintiff has failed to produce any evidence to substantiate that assertion.

In opposition to the instant motion, Plaintiff again states that "on each and every occasion" he contacted Wilson-McShane, Wilson-McShane "confirmed that his calculations [based on the ABPA 'report hours' figures] accurately reflected the pension benefit to which he was entitled." (Pl.'s Mem. at 45.) In support he cites his own declaration along with five exhibits from the record. Three of the five exhibits were documents provided to Plaintiff by ABPA or the 793 Plan (Wandling Decl., Exs. E, F, and H), not Wilson-McShane. The third (Id., Ex. I) is a "Pension Benefit Report" prepared by Wilson-McShane on or about March 3, 2009. While this report contains the erroneous "hours reported" figures from the ABPA statements, it is undisputed that Wilson-McShane made clear to Plaintiff that it did not consider those figures to be relevant to his pension calculations and did not rely on those figures when it provided him with estimates of his retirement benefits. (Kendall Dep. 23:1-6.) Moreover, while the Pension Benefit Report does include the erroneous "hours reported" figures, it does not make any reference to the benefit calculation advanced by Plaintiff. The final exhibit

cited (Wandling Decl., Ex. J) is a listing of pension contribution rates provided to Plaintiff by a TCIW trustee. That exhibit makes no mention of benefit calculation methods.

Remaining is Plaintiff's own statements that "Wilson-McShane repeatedly represented . . . that the 793 Plan monthly benefit was calculated" according to his proposed method (Kendall Decl. ¶ 15) and that "Wilson-McShane confirmed that his calculations accurately reflected the monthly pension benefit to which Kendall was entitled." (Pl.'s Mem. at 45.) These statements echo Plaintiff's original assertions from his complaint, but Plaintiff points to no evidence indicating when or by whom such statements were made. Moreover, Plaintiff's assertions conflict directly with his sworn deposition testimony. When asked about the March 2009 meeting in which Wilson-McShane provided him with the Pension Benefit Report, Plaintiff confirmed that a Wilson-McShane representative told him that the ABPA "hours reported" figures were "worthless" for the purposes of calculating his pension. (Kendall Dep. at 23:1-6.) Plaintiff also affirmed that "[n]obody [at Wilson-McShane] said [his calculations] were correct." (Id. at 81:13.)

At summary judgment, "[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005). Viewing the evidence in the light most favorable to Plaintiff, a reasonable fact-finder could not find that Wilson-McShane made misleading or contradictory statements to Plaintiff with respect to his pension benefits. Apart from Plaintiff's self-serving declaration, which does not point to any statement in particular and is directly contradicted by his deposition testimony, the evidence supports only a finding that Wilson-McShane consistently denied the validity of Plaintiff's proposed benefit calculation.

The Court concludes that the terms of the plan are unambiguous and also that the evidence could not support a finding that Wilson-McShane ever affirmed Plaintiff's erroneous benefit calculations. These conclusions provide independent bases for the failure of Plaintiff's promissory estoppel claim. The Court will therefore grant summary judgment in Wilson-McShane's favor as to that claim, and the Court need not address the additional questions of whether

Wilson-McShane is a fiduciary under ERISA or whether extraordinary

circumstances are present in this case.


Accordingly, based on the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants Twin City Iron Workers Pension Plan,

Board of Trustees of the Twin City Iron Workers Pension Plan, and Wilson-

McShane Corporation's Motion for Summary Judgment [Docket No. 37] is

**GRANTED**.  This action is hereby **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  September 6, 2012          s/ Michael J. Davis
                                   Michael J. Davis
                                   Chief Judge
                                   United States District Court